[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Sowell,* Slip Opinion No. 2016-Ohio-8025.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-8025

THE STATE OF OHIO, APPELLEE, *v.* SOWELL, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Sowell,* Slip Opinion No. 2016-Ohio-8025.]**

*Criminal Law—Aggravated murder—Right to public trial—Death penalty affirmed.*

(No. 2011-1921—Submitted April 5, 2016—Decided December 8, 2016.)

APPEAL from the Court of Common Pleas of Cuyahoga County,

No. CR-09-530885.

_____

O'DONNELL, J.

{¶ 1} Anthony Sowell appeals from the judgment of the Cuyahoga County Common Pleas Court in connection with 11 capital convictions and sentences of death arising out of the serial killing of 11 women in Cleveland, Ohio.  Sometime before October 28, 2009, Sowell kidnapped and murdered these 11 women and buried or concealed them at his home located at 12205 Imperial Avenue on the east side of Cleveland.  Members of the Cleveland Police Department investigating a rape complaint against Sowell discovered the bodies of Diane Turner and Telacia

Fortson in Sowell's house. Police later found the bodies of eight more women and the skull of another woman in or around the home, and they obtained additional evidence demonstrating that Sowell had attempted to kill three other women.

{¶ 2} A grand jury returned an 85-count indictment against Sowell, and following trial in common pleas court, a jury convicted him of 11 counts of aggravated murder, each containing death-penalty specifications, and recommended death sentences for each of the 11 aggravated murders. The trial court accepted those recommendations and sentenced Sowell to 11 death sentences on those counts.

{¶ 3} After review, we affirm Sowell's convictions and death sentences.

**Facts and Procedural History**

{¶ 4} On October 28, 2009, a member of the Cleveland Police Department, investigating a rape complaint filed by Latundra Billups, obtained warrants to arrest Sowell and to search his home at 12205 Imperial Avenue in Cleveland. When officers executed the search warrant the next evening, Sowell was not at home. In a room on the third floor of the house, however, police found two decomposed female corpses lying on the floor, which DNA analysis later confirmed were the bodies of Diane Turner and Telacia Fortson.

{¶ 5} Police obtained another warrant the next day and resumed searching Sowell's house, this time accompanied by personnel from the county coroner's office and a cadaver dog. They located a body beneath the basement staircase covered by a large mound of dirt and two more on the third floor, one inside a black plastic bag and one in a crawlspace concealed beneath more dirt. DNA analysis identified the body in the basement as Janice Webb, the body in the bag as Nancy Cobbs, and the body in the crawlspace as Tishana Culver.

{¶ 6} In the backyard, the cadaver dog alerted to a spot near the back porch, where police located another body buried in a shallow grave that DNA analysis identified as Tonia Carmichael.

**{¶ 7}** The next day, on October 31, Sowell was seen on Mount Auburn Avenue by a member of the public who had recognized him from news broadcasts. Police were alerted and Sowell was arrested.

**{¶ 8}** On November 3, police obtained another search warrant for Sowell's residence and this time arranged for a backhoe to be brought to the property. They uncovered four more corpses and from DNA analysis eventually identified them as the bodies of Michelle Mason, Kim Smith, Amelda Hunter, and Crystal Dozier. In addition, a human skull, which DNA analysis eventually identified as belonging to Leshanda Long, was found in a black plastic bag inside a red bucket in the basement. No other parts of her body were located.

**{¶ 9}** Autopsy results showed that Culver had suffered a fractured hyoid bone in her neck, suggesting manual strangulation. Seven bodies—Carmichael, Cobbs, Dozier, Fortson, Hunter, Mason, and Webb—had ligatures around their necks, and the coroners concluded that their deaths had been caused by ligature strangulation. The coroners further concluded that Long, Smith, and Turner were killed by "homicidal violence" of "undetermined" type. Other evidence showed that six bodies—Carmichael, Cobbs, Culver, Dozier, Smith, and Webb—had bindings, or the remains of bindings, around their wrists and/or ankles.

**{¶ 10}** Following the investigation, a grand jury returned an 85-count indictment against Sowell. Counts 1 through 66 dealt with the 11 murder victims. Regarding each victim, the grand jury indicted Sowell on two counts of aggravated murder: one for prior calculation and design, R.C. 2903.01(A), and one for felony murder, R.C. 2903.01(B), predicated on kidnapping.

**{¶ 11}** Each aggravated-murder count had 15 death-penalty specifications. Two felony-murder specifications pursuant to R.C. 2929.04(A)(7) were attached to each count—the first was predicated on kidnapping to terrorize or inflict serious physical harm on the victim and the second was predicated on kidnapping to engage in sexual activity with the victim against the victim's will.

**{¶ 12}** In addition, each aggravated-murder count had 13 course-of-conduct specifications pursuant to R.C. 2929.04(A)(5), alleging that the murder was part of a course of conduct involving the purposeful killing of or attempt to kill two or more victims. Each course-of-conduct specification cited one of the other murders or attempted murders in this case as part of the course of conduct engaged in by Sowell.

**{¶ 13}** Each aggravated-murder count and most of the noncapital counts also included a sexual-motivation specification pursuant to R.C. 2941.147, a sexually violent predator specification pursuant to R.C. 2941.148, a repeat-violent-offender specification pursuant to R.C. 2941.149, and a prior-conviction specification reflecting a prior conviction of attempted rape.

**{¶ 14}** With respect to each murder victim, the indictment charged two counts of kidnapping: one under R.C. 2905.01(A)(3) (having a purpose to terrorize or to inflict serious physical harm) and another under R.C. 2905.01(A)(4) (having a purpose to engage in sexual activity with the victim against the victim's will). Finally, the indictment charged one count of abuse of a corpse and one count of tampering with evidence with respect to each aggravated murder victim.

**{¶ 15}** Counts 67 to 85 charged Sowell with crimes against Latundra Billups, Shawn Morris, and Gladys Wade, each of whom survived their encounters with Sowell. As to these victims, whom the state identified as Jane Does in the original indictment, Sowell was charged with two counts of kidnapping, pursuant to R.C. 2905.01(A)(3) and (A)(4), and one count of attempted murder, pursuant to R.C. 2923.02 and 2903.02(A). Sowell was also charged with two counts of rape committed against Billups and Morris and one count of attempted rape committed against Wade. Additionally, he was charged with two counts of felonious assault pertaining to Billups and one count each with regard to Morris and Wade. Finally, he was indicted for one count of the aggravated robbery of Wade.

**{¶ 16}** After the state's presentation of evidence during the guilt phase of the trial, the defense moved for acquittal. The trial court granted the motion as to Counts 38, 39, and 40 (felony-murder and kidnapping of Long) and Specifications 1, 2, and 16 (felony murder and sexual-motivation specifications) to Count 37 (aggravated murder of Long with prior calculation and design).

**{¶ 17}** The defense did not call any witnesses in its case-in-chief, but it submitted a number of exhibits into evidence before it rested. The jury returned verdicts finding Sowell not guilty of Count 85 (aggravated robbery of Wade) but guilty of all other counts and specifications.

**{¶ 18}** Prior to the penalty phase of trial, the trial court merged the aggravated-murder counts for sentencing purposes. The state elected to proceed under R.C. 2903.01(A), and thus, the jury considered 11 counts of aggravated murder. Pursuant to the state's election, the counts based on R.C. 2903.01(B) were not submitted to the jury during the penalty phase of the trial.

**{¶ 19}** At the conclusion of its penalty-phase deliberations, the jury recommended death sentences for each of the 11 aggravated murders. The trial court accepted the recommendations and sentenced Sowell to death on each of the 11 counts.

**{¶ 20}** Sowell appealed as of right to this court pursuant to Article IV, Section 2(B)(2)(c) of the Ohio Constitution.

### Courtroom Closures

**{¶ 21}** The trial court conducted an in camera session on July 21, 2010, involving a hearing on Sowell's motion to suppress statements he made to police, and subsequent in camera sessions from June 6 through 21, 2011, relating to the individual voir dire of prospective jurors on attitudes toward the death penalty, pretrial publicity, and requests to be excused for hardship reasons.

**{¶ 22}** Although Sowell did not present a proposition of law challenging the courtroom closures and thus failed to preserve the issue for appeal, *see generally*

*State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, on September 3, 2014, we ordered additional briefing on whether these closures denied Sowell his Sixth Amendment right to a public trial. 140 Ohio St.3d 1411, 2014-Ohio-3785, 15 N.E.3d 881.

### *The Suppression Hearing*

**{¶ 23}** Sowell moved to suppress statements made during a series of police interrogations on the basis that he had not been properly advised of his *Miranda* rights and that he did not knowingly, intelligently, and voluntarily waive them because he suffered from a psychotic disorder or severe mental illness.

**{¶ 24}** The trial court determined that due to the sensitive nature of the evidence regarding Sowell's mental health issues and the potential prejudice to the jury pool, it would conduct the suppression hearing in camera. Defense counsel objected for the record.

**{¶ 25}** At the hearing, the state presented testimony from police officers and video recordings of Sowell's interrogation. In those recordings, Sowell never admitted to murdering the 11 victims and denied having any memory of killing them or knowing that their bodies were buried and hidden on his property. He explained that he had encountered various women, mostly from the Mount Pleasant area of East Cleveland where he lived, and from time to time he would hear a "voice" saying something about "bad people"; then he would "go blank" or "black out." Sowell described dreams in which he "hurt somebody" by choking a woman with his hands. Sowell stated that after these dreams, he would wake up and would find that the woman had left without saying goodbye. When he woke from his dreams, his body felt "tired" as if he had been working.

**{¶ 26}** He said that he had dreamed about the "bad ones" who were doing drugs or soliciting on the street when they had children or families, and he described himself as "the punisher." These women needed to be punished because they were "cons" who tried to "hustle" him out of money and drugs. Sowell explained that

6

the voice in his head told him what he was "supposed to do. It's like I was supposed to rape these girls." Sowell admitted that all the women found in the house were bad, and he was able to give descriptions of some of the victims.

**{¶ 27}** The trial court denied the motion to suppress these statements, finding that Sowell knowingly, intelligently, and voluntarily had waived his *Miranda* rights during the police interviews and that his statements were neither coerced nor the result of a psychosis that interfered with his ability to make free and rational choices.

**{¶ 28}** The Sixth Amendment right to a public trial is a protection for the accused and extends to a hearing on a motion to suppress evidence. *Waller v. Georgia*, 467 U.S. 39, 46-47, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). However, "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Id.* at 45. Accordingly, "the party seeking to close the [suppression] hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id.* at 48, citing *Press-Enterprise Co. v. Superior Court of California, Riverside Cty.*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984).

**{¶ 29}** The Supreme Court in *Waller* recognized that the accused "should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee" during a suppression hearing, *id*. at 49, noting that the benefits of a public trial are "intangible, difficult to prove, or a matter of chance," *id*. at fn. 9. Yet it held that the remedy for the violation in that case was not a new trial but a new suppression hearing, because "[i]f, after a new suppression hearing, essentially the same evidence is suppressed, a new trial presumably would be a windfall for the defendant, and not in the public interest." *Id*. at 50. The court

concluded that "[a] new trial need be held only if a new, public suppression hearing results in the suppression of material evidence not suppressed at the first trial, or in some other material change in the positions of the parties." *Id*.

{¶ 30} The trial court in this case identified an overriding interest for conducting the hearing in camera, stating on the record that it had closed the courtroom "due to the sensitive nature of the evidence and potential for suppression of evidence that, if released to the public at this time, would potentially prejudice any jury pool." Thus, the trial court undoubtedly recognized that given the intense media interest generated by Sowell's trial involving the serial killing of 11 women in Cleveland, closing the suppression hearing was necessary to guarantee Sowell a fair trial and to avoid tainting the jury pool with statements that he would encounter various "bad" women in his neighborhood, hear a voice telling him to rape them, black out, and then dream of strangling them before waking to find them gone.

{¶ 31} As the Supreme Court explained in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966),

> Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. * * * If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences.

8

*Id*. at 362-363. The court also noted that a trial court has a duty to protect the accused from "inherently prejudicial publicity which saturate[s] the community." *Id*. at 363.

{¶ 32} Although the trial court recognized the high degree of public interest in the trial as well as the potential for publicity to prejudice Sowell's right to a fair public trial, it did not make an express finding that the limited closure of the proceeding was in fact no broader than necessary to protect that interest. Nonetheless, it is apparent from the record that the trial judge concluded that the closure of the suppression hearing was no broader than necessary to protect Sowell's right to a fair proceeding and to avoid prejudice to the jury pool. This case is factually distinguishable from *Waller*, where the trial court closed a seven-day suppression hearing to avoid revealing the contents of a two-and-one-half-hour wiretap audio recording, so that "the closure was far more extensive than necessary." 467 U.S. at 49, 104 S.Ct. 2210, 81 L.Ed.2d 31. Here, closure was limited to considering the suppression of Sowell's statements, and the court specifically stated that it would reopen the courtroom for argument on other matters. Thus, the trial court obviously concluded that closure was necessary to protect Sowell's right to a fair trial, but it failed to state that finding on the record. From our review of the record, we are convinced that closure was no broader than necessary to protect that interest.

{¶ 33} Nor did the trial court state on the record that it had considered reasonable alternatives to conducting the suppression hearing in camera, but it is obvious that the court had no reasonable alternative other than to close that limited proceeding to the public in order to protect the right of the accused to a fair public trial. The trial court understood that if Sowell's statements were publicized but subsequently suppressed, then his right to a fair trial by an impartial jury would be compromised. Other than closing the hearing, there was no way for the court to

examine the admissibility of Sowell's statements without also possibly exposing those statements and prejudicing potential jurors.

{¶ 34} Because the trial court identified an overriding interest supporting closure of the suppression hearing and because the record demonstrates that closure was narrowly drawn and limited in scope and was the only reasonable option to protect that interest, the trial court did not abuse its discretion in ordering the limited closure of the courtroom.

{¶ 35} *Waller* is factually distinguishable from this case, but even if *Waller* requires this court to presume prejudice from the closure of a suppression hearing, the remedy the Supreme Court adopted there is not applicable here. In *Waller*, the essence of the state's case against the accused consisted of wiretaps and other evidence that, if suppressed, could have precluded the state from obtaining a conviction. Explaining that "the remedy should be appropriate to the violation," the Supreme Court ordered a public suppression hearing and held that a new trial would be required only if the new hearing resulted in a "*material* change in the positions of the parties." (Emphasis added.) *Waller* at 50.

{¶ 36} That is not the case in this instance, however, because even if we presume prejudice from the closure of the courtroom, a new suppression hearing would not result in a *material* change in the positions of the parties. Based on the record, any reasonable jurist would find that Sowell knowingly, intelligently, and voluntarily waived his *Miranda* rights. Even assuming that Sowell's statements to police would have been suppressed at a public hearing, the omission of those statements from the evidence presented at trial would not have affected the outcome. As we explained in *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 87, "[if] a new hearing could not materially change the position of the parties, there is no need for either a new hearing or a new trial."

{¶ 37} Although Sowell's statements to police are incriminating, the state presented overwhelming *independent* evidence of guilt supporting Sowell's convictions and sentence.

{¶ 38} Police located ten bodies and one human skull on Sowell's property; eight of the victims appeared to have been strangled to death, and many of the bodies were found nude or nude from the waist down and/or had bindings, or the remains of bindings, around their wrists and/or ankles. The condition of the bodies establishes Sowell's course of conduct in kidnapping women, sexually assaulting them, and strangling them to death. And significantly, five of Sowell's victims survived and testified at trial, providing proof of his course of conduct.

{¶ 39} One, Vanessa Gay, testified that in September 2008, Sowell brought her to the third floor of his home to use drugs but then punched her in the face, ordered her to take off her clothes, and repeatedly raped her over several hours. When Sowell permitted her to go to the bathroom, she saw something in a room off the hallway that looked like a headless body, propped up in a seated position and "taped up." When she returned to the bedroom, Sowell said repeatedly, "You're going to tell, I know you're going to tell," but she persuaded him to let her go.

{¶ 40} Another victim, Gladys Wade, testified that in December 2008, she had declined Sowell's invitation to drink with him and was walking down Imperial Avenue when he grabbed her clothing, dragged her toward his house, and choked her until she lost consciousness. She awoke in Sowell's house, and he ordered her to remove her clothes and punched her in the face. When she clawed his eyes and tried to escape, he began strangling her, saying, "you can scream all you want, you're going to die." She fought Sowell off, made it out of the house, and flagged down a police cruiser. Although Sowell was arrested, he was later released because the arresting officer mislabeled the offense on the incident report.

{¶ 41} A third female, Tanja Doss, testified that she had previously dated Sowell and had accepted an invitation to "get high" at his house in April 2009.

After they watched a basketball game and smoked crack, Sowell seized her by the throat and began choking her, saying, "you can be the next crack head bitch dead up in the street and nobody give a fuck about you." She complied with his order to remove her clothes, and she lay down on the bed, "curled up in * * * a fetal position," and cried herself to sleep. The next morning, Sowell acted as if nothing had happened. Doss made up a story about going to see her granddaughter in the hospital, and he let her leave.

{¶ 42} Another victim, Latundra Billups, testified that she had previously smoked crack on the third floor of Sowell's house and that sometime in September 2009, she accompanied him to drink beer with him at his home. After they smoked crack, Sowell took her to a room on the second floor that was empty except for a blanket and a piece of an extension cord. He hit her hard in the face, ordered her to remove her clothes, and raped her. As he was raping her, he placed the extension cord around her neck and choked her until she blacked out. When she awoke hours later, Sowell appeared "startled" and "shocked." He told her that he was going to kill her and himself "because he knew he was going to jail," but she persuaded him to release her.

{¶ 43} A fifth victim, Shawn Morris, testified that she met Sowell one morning in October 2009 and went to his home to drink and smoke crack. She left after five hours, but she came back to retrieve her identification card after she realized that she had left it in his house. After he opened the door and she came inside, Sowell placed her in a chokehold, forced her upstairs, ordered her to remove her clothes, and violently raped her. When he left the room to close windows to prevent her screaming from being heard, she escaped through a third-floor window and hung naked from a ledge. Sowell tried to pull her back in, but when he could not, he "shoved [her] down as hard as he could." She fell to the ground, was seriously injured, and lost consciousness. Bystanders testified that Sowell, who was also naked, tried to bring her back inside the house while she was unconscious

and bleeding, but a crowd had gathered and tried to prevent him from moving her due to the extent of her injuries. Although Sowell later did move her to the door of his house, emergency personnel arrived and transported her to the hospital.

{¶ 44} These five witnesses not only established a behavioral fingerprint identifying Sowell as the person who murdered the 11 women found in his house and buried in his yard, but also their testimony showed that he engaged in a course of conduct in which he lured women to his home with the promise of drugs and then kidnapped, sexually assaulted, and strangled them to death. *See State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994). If there were any doubt that it was Sowell who murdered these women, it was eviscerated by the testimony of Wade, Billups, and Morris that he also tried to kill them.

{¶ 45} In his opening brief filed in this court, Sowell did not challenge the trial court's ruling at the suppression hearing, nor did he challenge the sufficiency of the evidence supporting the convictions. Rather, his attorneys recounted the history of his case and wrote: "The jury, any jury, would find Sowell guilty of the 22 counts of aggravated murder. The jury, any jury, would find Sowell guilty of at least one Course of Conduct specification for each aggravated murder." Sowell argued that based on the "overwhelming evidence" of guilt, the only reasonable strategy at trial was to concede guilt rather than pursue a defense that there was reasonable doubt as to who killed the victims. These admissions fortify the conclusion that the trial court's error in closing the suppression hearing prior to admitting Sowell's statements to police was not material.

{¶ 46} Accordingly, overwhelming independent evidence of guilt proves beyond a reasonable doubt that Sowell committed the aggravated murders of 11 women and the felony-murder and course-of-conduct death specifications associated with those counts, including the pattern of behavior engaged in by Sowell, his course of conduct, his identification by those who escaped together with the site of the killings, and the elaborate efforts to conceal the bodies. And with

respect to the 11 death sentences imposed in this case, the evidence establishes that the aggravating circumstances overwhelmingly outweigh the mitigating factors.

**{¶ 47}** Thus, even if Sowell's statements to police were suppressed, he would have been convicted and sentenced to death. Because the admission of his statements did not affect the outcome of the trial and because a new suppression hearing would not result in a material change in the positions of the parties, ordering a new suppression hearing would be a vain act, "an empty formality," and just the type of "windfall" for the defendant that *Waller* sought to avoid. *Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, at ¶ 87.

*Individual Voir Dire*

**{¶ 48}** The court also closed the courtroom during the individual voir dire of prospective jurors. Not only did the defense not object to the closure, but also it filed a "Request for Individually Sequestered Voir Dire" specifically asking that individual voir dire take place "outside the presence and hearing of other members of the venire" and specifically requesting "individual sequestered voir dire *within the Court's chambers*." (Emphasis added.) In addition, at a pretrial conference on November 23, 2010, defense counsel asked that voir dire be conducted "individually *and in camera*." (Emphasis added.) Defense counsel argued that "it would be better to do this limited individualized questioning in chambers so the jurors don't have to worry about the camera and that their responses will be broadcast, etc." Counsel noted, "My experience is [that in-chambers voir dire] encourages the jurors to be more forthright" and "will put the jurors more at ease and get more honest answers." Later, counsel again asked the court to "please note our preference of doing things in chambers initially."

**{¶ 49}** After the completion of the individual voir dire and at the request of the prosecution, the trial court stated on the record its reasons for closing the courtroom for individual voir dire. The prosecutor then asked whether Sowell was

willing to affirmatively consent to the procedure the trial court had used, but defense counsel declined, stating: "We waive nothing, your Honor."

{¶ 50} The doctrine of invited error specifies that a litigant may not "take advantage of an error which he himself invited or induced." *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, *Lincoln-Mercury Div.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus. "This court has found invited error when a party has asked the court to take some action later claimed to be erroneous, or affirmatively consented to a procedure the trial judge proposed." *State v. Campbell*, 90 Ohio St.3d 320, 324, 738 N.E.2d 1178 (2000). Moreover, the doctrine of invited error applies to the erroneous closure of courtroom proceedings. *See State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 64, citing *State v. Seiber*, 56 Ohio St.3d 4, 17, 564 N.E.2d 408 (1990).

{¶ 51} Sowell contends that his request for individually sequestered voir dire sought only to have each prospective juror's voir dire conducted outside the presence of other prospective jurors. He denies that his motion requested that the individual voir dire also be closed to the public. However, a request for an "in chambers" or "in camera" voir dire is equivalent to a request to exclude the public, since a judicial chambers "is ordinarily not accessible to the public." *State v. Wise*, 176 Wash.2d 1, 12, 288 P.3d 1113 (2012). "In camera" has been defined to mean either "[i]n the judge's private chambers" or "[i]n the courtroom *with all spectators excluded*." (Emphasis added.) *Black's Law Dictionary* 878 (10th Ed.2014). Moreover, a trial court may not exclude cameras from "court proceedings that are open to the public." *See* Sup.R. 12(A). Thus, defense counsel's explicit request for voir dire in chambers, with cameras excluded, cannot be interpreted as anything but a request to close the proceedings to the public. Further, defense counsel stated that the defense was not waiving the right to a public trial only *after* the closed individual voir dire that counsel had requested was completed.

**{¶ 52}** Accordingly, Sowell invited the court to close the individual voir dire in this case, and pursuant to the invited-error doctrine, he is not entitled to complain of an error that he himself induced the trial court to commit.

**{¶ 53}** Thus, Sowell's supplemental propositions of law are overruled.

### Change of Venue

**{¶ 54}** In the first proposition of law, Sowell contends that prejudicial pretrial publicity denied him a fair trial, that the publicity was so pervasive that the trial court should have presumed prejudice, and that the court erred by denying his requests for a change of venue.

**{¶ 55}** The voir dire began in June 2011, more than 18 months after the discovery and exhumation at Sowell's home located in a major metropolitan area. Although Sowell refers to Cleveland as a "small city," the pool of jurors was drawn from Cuyahoga County, whose population in the 2010 Census was 1,280,122. *See www.census.gov/2010census/popmap/ipmtext.php?fl=39:39035* (accessed Oct. 17, 2016).

**{¶ 56}** The larger the community, the more likely that impartial jurors can be found within it. *See State v. Gribble*, 165 N.H. 1, 19-20, 66 A.3d 1194 (2013). And "[i]t is well recognized that in a small rural community 'in contrast to a large metropolitan area, a major crime is likely to be embedded in the public consciousness with greater effect and for a longer time.' * * * Thus both the size and the character of the county's population, while not determinative, are factors to be considered." *People v. Hamilton*, 48 Cal.3d 1142, 1158, 259 Cal.Rptr. 701, 774 P.2d 730 (1989), quoting *People v. Martinez*, 29 Cal.3d 574, 581, 174 Cal.Rptr. 701, 629 P.2d 502 (1981).

**{¶ 57}** The record indicates widespread knowledge of the case in Cuyahoga County. Almost 200 prospective jurors completed a questionnaire containing a question about pretrial publicity. Responses to that question indicate that only about six of the prospective jurors had not been exposed in some form to pretrial

16

publicity about the case. During voir dire, 128 members of the venire were questioned about pretrial publicity. Of these, all but three had been exposed to some pretrial publicity about Sowell's case, but 62 of them stated that they had not formed an opinion about the case and could set aside whatever they had heard; 17 others had formed opinions about Sowell's guilt but stated that they were able to set their opinions aside and decide the case on the basis of the evidence presented in court. Eight others had formed opinions, but the court excused them for other reasons. Only 22 jurors were excused for cause on the ground that they had formed opinions that they could not set aside.

{¶ 58} Sowell relies on *Irvin v. Dowd*, 366 U.S. 717, 727, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), where "370 prospective jurors or almost 90% of those examined on the point * * * entertained some opinion as to guilt," and 268—over 62 percent of those examined on pretrial publicity—were actually excused "as having fixed opinions as to the [accused's] guilt." That is not the circumstance exhibited in this case, and *Irvin* is therefore factually distinguishable. The publicity prior to Sowell's trial was not so pervasive that Sowell was denied a fair trial.

{¶ 59} In *State v. Lundgren*, 73 Ohio St.3d 474, 479-480, 653 N.E.2d 304 (1995), we held that the court had not abused its discretion in denying a change of venue under circumstances comparable to those in this case:

> The trial court selected a jury following an extensive eight-day voir dire which included individualized questioning as to the impact of pretrial publicity. The trial court readily excused those in the venire who had formed fixed opinions or were otherwise unsuitable. The jurors selected did not appear to have been excessively exposed to media publicity. Those who said they held views expressed tentative impressions and all of the jurors selected promised to set aside any information

received or views held and decide the case only on the evidence offered at trial. Despite the fact that pretrial publicity was extensive, the trial judge was in the best position to judge each juror's demeanor and fairness. [The accused] has not established the rare case in which prejudice is presumed.

**{¶ 60}** Similarly, here, we cannot conclude that the trial court abused its discretion in denying Sowell's motions for change of venue. We overrule this proposition of law.

### Voir Dire

#### *Discussion of Mitigating Factors*

**{¶ 61}** Sowell's second proposition of law asserts that the trial court impermissibly restricted voir dire of prospective jurors by refusing to let defense counsel inquire of them regarding their understanding of and attitudes toward the mitigating factors that could arise based on the evidence in the case. This claim is not well taken. In *State v. Jones*, 91 Ohio St.3d 335, 338, 744 N.E.2d 1163 (2001), this court held: "During voir dire, a trial court is under no obligation to discuss, or to permit the attorneys to discuss, specific mitigating factors." Thus, this proposition of law is overruled.

#### *Challenges for Cause*

**{¶ 62}** The third proposition of law contends that the trial court erred in overruling challenges for cause to a number of prospective jurors.

**{¶ 63}** On a challenge for cause, "[t]he ultimate question is whether the 'juror sw[ore] that he could set aside any opinion he might hold and decide the case on the evidence, and [whether] the juror's protestation of impartiality [should be] believed.' " (Brackets sic.) *White v. Mitchell*, 431 F.3d 517, 538 (6th Cir.2005), quoting *Patton v. Yount*, 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847

(1984). A trial court's resolution of a challenge for cause will be upheld on appeal unless it is so unsupported by substantial testimony that it constitutes an abuse of discretion. *State v. Tyler*, 50 Ohio St.3d 24, 31, 553 N.E.2d 576 (1990); *State v. Wilson*, 29 Ohio St.2d 203, 211, 280 N.E.2d 915 (1972).

Death Qualification

{¶ 64} A defendant has a constitutional right to exclude for cause any prospective juror who will automatically vote for the death penalty. *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). "A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Id.* at 729.

{¶ 65} Question 7 on the jury questionnaire asked: "In your opinion, is the death penalty the only appropriate sentence in a case involving the purposeful killing of 11 people * * * at separate times over a two and one-half year period or would a sentence of life in prison without the possibility of parole also be an appropriate sentence?" Sowell contends that several prospective jurors answered this and other questions in a way that shows them to be automatic votes for a death sentence in the event of conviction.

{¶ 66} In response to this question, Juror 23 wrote: "Yes, the death penalty is appropriate if found guilty." However, in response to a different question asking jurors to state "your **GENERAL FEELINGS** regarding the death penalty" (boldface and capitalization sic), Juror 23 stated: "an eye for an eye seems fair depending on the circumstances. But I think it's on a case by case basis." On Question 8, asking whether a life sentence with possible parole after 25 or 30 full years could be appropriate, Juror 23 wrote: "I'm not sure if any of these questions can be answered without first hearing the facts." And on Question 9, which asked: "What would be important for you to know in deciding whether to impose a life sentence without the possibility of release or a sentence of death?" the juror wrote:

"Everything." The answers to Questions 8 and 9 support the trial court's finding that Juror 23 was not an automatic-death-penalty juror.

{¶ 67} That is further confirmed by Juror 23's voir dire, which Sowell glosses over in his focus on the questionnaire. Juror 23 said: "[E]very situation is different, but * * * if someone knowingly and purposely kills another human being, * * * you would have to look at their reasons for it, and why, and * * * if * * * they knew exactly what they were doing, then I think they should also die." Juror 23 later disagreed when defense counsel suggested that the following statement represented his views: "[R]egardless of the second phase, if you take a life * * * in phase one, if you're found guilty, and you've taken a life, then your life must be taken." Juror 23 responded: "No. * * * I said on a case-by-case circumstance." He stated that he could consider each of the life alternatives if the aggravating circumstances were outweighed by the mitigating factors. Thus, the record supports the trial court's ruling on Sowell's challenge for cause.

{¶ 68} On the questionnaire, Juror 46 answered the question regarding whether the death penalty was the only appropriate sentence by stating, "I strongly believe he should go straight to death row with no chance of appeals. The only decision left to be made is the date of his execution." However, on voir dire she said she could consider all three of the lesser options. When asked about what she had written on her questionnaire, she stated: "My answer is based on all of the * * * information that I had going into this case, without knowing the evidence, without knowing * * * any other * * * details." She stated: "Those are my views, but * * * if I was chosen as a juror, I would take it as my job, I would take it seriously and I would leave all of that at the door." Accordingly, the record supports the trial court's denial of Sowell's for-cause challenge to this juror.

{¶ 69} Juror 60 was asked during voir dire if he would consider a defendant's background in deciding on a sentence. Juror 60 agreed "[o]nly to the extent that it was part of the evidence presented by either side or both sides * * *.

If that was part of the evidence * * * as to what happened and why and so on, only to that extent. Otherwise, no." He then stated that he would consider "all factors that are relevant presented by both sides," but "[o]nly relevant factors." He clarified that if either side brought up something that was "totally irrelevant to what is being discussed," he would "disregard that as a nonissue."

{¶ 70} The defense challenged Juror 60 for cause on the ground that he "has his own concept of what is relevant, which may be inconsistent with what the law says." The trial judge overruled the challenge. The judge found that Juror 60's answer indicated that he "doesn't take any preconceived opinions with him concerning anything" and "would consider all factors."

{¶ 71} Juror 60 was not an automatic-death-penalty juror and thus had not "already formed an opinion on the merits." *Morgan*, 504 U.S. at 728, 112 S.Ct. 2222, 119 L.Ed.2d 492. Moreover, the trial court appears to have understood Juror 60's statement that he would "disregard" evidence that was "totally irrelevant to what is being discussed" as meaning that he would give no weight to evidence that he did not find to be mitigating. The judge's view of Juror 60's words is reasonable.

{¶ 72} Question 8 on the jury questionnaire asked: "In your opinion, in a case [involving the purposeful killing of 11 people], would a sentence of life in prison with the possibility of parole after either 25 full years of imprisonment, or 30 full years of imprisonment, also be an appropriate sentence?" Sowell claims that several prospective jurors should have been disqualified because their answers to Question 8 indicated that they were unable to consider the full range of possible life-sentencing options.

{¶ 73} Juror 21 answered "No" to question 8 with no elaboration. But, while the defense challenged Juror 21 for cause, it did not challenge him on the ground Sowell now cites—his alleged inability to consider the full range of sentencing options. Moreover, as Sowell concedes, Juror 21 stated during voir dire

that he could fairly consider a life sentence with possible parole after either 25 or 30 full years.

{¶ 74} Juror 22 answered "No" to question 8 without further elaboration. But on voir dire, she stated that she could fairly consider the options of life with possible parole after 25 or 30 full years.

{¶ 75} Juror 24 said during voir dire that she "would not lean toward" life with parole eligibility after 25 full years and that she "would be more negative toward that." When asked what her answer "today" would be to question 8 about a life sentence with possible parole, she said: "My answer today is leaning toward no. I might have a little bit of flexibility, but I am definitely leaning towards no." This answer applied to the parole-after-25-years life sentence; asked about life with possible parole after 30 years, she stated: "That's a possibility that I may be more flexible and say possibly." But she repeated that she could not fairly consider life with possible parole after 25 years.

{¶ 76} After follow-up questioning about some of the concepts, the prosecutor asked Juror 24 to explain her answer on the questionnaire stating that a sentence of life with possible parole after 25 or 30 years would not be appropriate. Juror 24 stated: "[F]rom what you're saying to me, *it changed my opinion on the no*." (Emphasis added.)

{¶ 77} Under defense questioning, she again stated that she could not fairly consider a life sentence with parole eligibility after 25 years:

> MR. PARKER: * * * So the question is, even though Mr. Sowell * * * in this hypothetical, he's been found guilty of aggravated murder and * * * at least one of the specifications * * *, under that situation * * * can you fairly consider a sentence of 25 full years of imprisonment before the possibility of parole?

JUROR NO. 24: I was given the option of 30 prior, and it seems to make a difference to me.

MR. PARKER: Okay, we'll ask both. Let's start with 25.

JUROR NO. 24: No.

MR. PARKER: The answer for 25 is no?

JUROR NO. 24: Yes.

MR. PARKER: You'd have an easier time with 30?

JUROR NO. 24: Easier time with 30.

MR. PARKER: Twenty-five, your answer is no.

JUROR NO. 24: No.

(Capitalization sic.)

{¶ 78} Finally, the trial judge explained to the juror that "we're not asking you to choose a sentence today" and then stated:

The only thing we want to know is * * * if the State is not able to prove that death is an appropriate sentence, would you be able to consider all three of those life options?

In other words, I think the question is going to be are you going to rule out one right off the bat, because that's the way you feel today, and there is nothing that is going to change your mind?

JUROR NO. 24: You really helped clarify it, my answer is not no, it's yes.

THE COURT: You would consider all three?

JUROR NO. 24: I would in that case.

(Capitalization sic.)

**{¶ 79}** Juror 24's final response suggests that her earlier answers were the product of confusion. Once the specifics were clarified for her, her answer was "not no, but yes." This final response indicated that she would consider all three life options.

**{¶ 80}** Juror 34 answered "No" without elaboration to Question 8 regarding the propriety of a life sentence with possible parole. However, on voir dire, he was asked if "after listening to everything, after weighing everything," he could "fairly consider a sentence of * * * 25 full years to life?" He said: "Yes, I probably could."

**{¶ 81}** Juror 36 indicated on her questionnaire that death or life without parole would be the only appropriate sentences and that life with possible parole after 25 or 30 years would not be appropriate. At one point during voir dire, she appeared to reiterate that opinion. However, the trial court asked her whether she could consider all three sentencing options, and she stated that she could.

**{¶ 82}** Juror 62 indicated on her questionnaire that a life sentence with possible parole after 25 or 30 years would not be an appropriate sentence, in her opinion. On voir dire, asked again to give "just [her] opinion," she stated that death was the only appropriate penalty for the purposeful, planned killing of an innocent person. Nevertheless, when asked on voir dire if she could consider the options of "25 full years to life" or "30 full years to life," Juror 62 stated that she could consider both "after hearing the facts."

**{¶ 83}** In each of these instances, the trial court determined that the juror's protestation of impartiality should be believed. *See Patton*, 467 U.S. at 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847. And in each instance, the trial court's determination was supported by "substantial testimony" given by each juror. *Tyler*, 50 Ohio St.3d at 31, 553 N.E.2d 576. Each challenged juror indicated that he or she was able to put aside his or her opinion that a life sentence involving possible parole was inappropriate for a case similar to this one.

{¶ 84} The trial court did not abuse its discretion when it accepted the sworn statements of these jurors on voir dire that they could set aside the opinions they had expressed on the questionnaire. It was the trial court's province to determine each juror's credibility, and the record does not show that the trial court abused its discretion with respect to any of these jurors.

Pretrial Publicity or Knowledge of Case

{¶ 85} Juror 22, who has been mentioned previously, answered yes to a question on her questionnaire asking whether she had "read, seen or heard media accounts" of this case. She wrote that she recalled "[h]ow they kept finding more & more bodies buried in and around this man's house. And the painfull [sic] reactions of so many families * * *."

{¶ 86} On voir dire, Juror 22 admitted forming an opinion "[t]hat more than likely Mr. Sowell was * * * the perpetrator" because "[t]he evidence that I heard through the media pointed in that direction." However, she specifically stated on voir dire that she would set aside that opinion and anything she had previously heard and would base her decision solely on the evidence that would come before her. She also stated that she had not been "glued to the TV wanting to know" about the murders. And while she recalled seeing televised reports on the finding of the bodies, she did not "know * * * any fine details."

{¶ 87} When the defense challenged Juror 22 for cause, counsel argued that her "body language" contradicted her promise to set aside what she had heard about the case. The trial judge rejected that claim: "I don't think there was any body language that would indicate that she was trying to say two different things." This is the type of credibility determination that falls within the trial court's discretion. We decline to disturb it.

{¶ 88} Juror 62, who has been mentioned previously, disclosed on voir dire that she had once lived across from Sowell's house on Imperial Avenue. The defense challenged this juror for cause in part because, according to defense

counsel, "it seems that she has quite a bit more information about the particular case than I think she's really telling us." However, nothing in the record supports that impression. Juror 62 had lived on Imperial Avenue "about 30 years earlier" and for only "a couple of months." Her decades-old connection with the area provides no reasonable basis to disturb the trial judge's decision to deny the challenge for cause.

{¶ 89} None of the claims in this proposition of law justify a finding that the trial court abused its discretion in denying these challenges for cause. This proposition is not well taken.

**Guilt Phase**

*Use of Initials to Sign Verdicts*

{¶ 90} In the tenth proposition of law, Sowell argues that 195 of the 196 verdicts the jury returned failed to comply with the requirement of Crim.R. 31(A) and R.C. 2945.171 that the verdict be "signed" by the jurors.

{¶ 91} When the court submitted the case to the jury during the guilt phase of trial, it noted that the jury would probably have "a couple hundred verdict forms * * * to complete." The judge said: "In order to facilitate that, * * * I think you can sign your names to the first series of verdict forms and perhaps even initial after your name so we have an idea or recognition of your initials. Then you can probably use your initials after that because as long as we know that it's your mark and that it is your verdict, then it is a proper form."

{¶ 92} After the jury was instructed to deliberate, defense counsel objected to the trial court's decision to permit the jurors to complete the verdict forms by initialing them. The jurors completed the verdict forms as suggested by the trial court.

{¶ 93} Crim.R. 31(A) provides: "The verdict shall be unanimous. It shall be in writing, signed by all jurors concurring therein, and returned by the jury to the judge in open court." Likewise, R.C. 2945.171 provides: "In all criminal cases

26

the verdict of the jury shall be in writing and signed by each of the jurors concurring therein."

{¶ 94} Sowell contends that "signed," as used in Crim.R. 31(A) and R.C. 2945.171, requires more than mere initials—that these provisions create a "requirement of signing one's name." The state argues that initials can constitute a signature if the juror initialing the verdict form so intends and if there is no prejudice from the use of initials.

{¶ 95} In cases involving statutory interpretation, the court "must begin [its] analysis by examining the language of the statute." *State v. Hanning*, 89 Ohio St.3d 86, 91, 728 N.E.2d 1059 (2000). "Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." R.C. 1.42.

{¶ 96} The term "signed" is not limited in meaning to the writing of one's name in full. *Black's Law Dictionary* defines the verb "sign" as follows: "To identify (a record) by means of a signature, *mark, or other symbol* with the intent to authenticate it as an act or agreement of the person identifying it * * *." (Emphasis added.) *Black's* at 1593. *See also* 2 Burrill, *Law Dictionary and Glossary* 467 (2d Ed.1860) (signature may be "expressed by the party's initials"); 2 Rapalje & Lawrence, *A Dictionary of American and English Law* 1192 (1883) ("a person signs a document when he writes or marks something on it in token of his intention to be bound by its contents").

{¶ 97} In construing the term "signed," we note that Crim.R. 1(B) provides that the Rules of Criminal Procedure "shall be construed and applied to secure the fair, impartial, speedy, and sure administration of justice, simplicity in procedure, and the elimination of unjustifiable expense and delay." *See also* R.C. 2901.04(B).

{¶ 98} We conclude that the term "signed," as used in Crim.R. 31(A) and R.C. 2945.171, is not limited to full signatures and that Crim.R. 31(B) will permit

jurors to use their initials to sign verdict forms at the direction of a trial court in the exercise of its discretion. Doing so will promote speed, administration of justice, and simplicity in procedure. Nor can we see any reason to suppose that our construction in this instance would hinder the "fair, impartial, speedy, and sure administration of justice."

{¶ 99} Our conclusion in this case recognizes that the jurors had 196 verdict forms to sign during the guilt phase of the trial, and in these circumstances, we do not believe that the trial court acted unreasonably, unconscionably, or arbitrarily by permitting jurors to sign one verdict form with their full signatures and then permitting them to use their initials to signify assent to the 195 remaining verdicts. Nothing in the record suggests that any of the jurors did not actually initial the verdict forms or that they did not intend their initials to function as their signatures. Accordingly, we overrule this proposition of law.

*Admission of Victim-Impact Evidence*

{¶ 100} In the sixth proposition, Sowell alleges that the trial court violated his constitutional rights by admitting victim-impact evidence during the guilt phase of trial, when family members of the victims testified about the victims. Sowell, however, fails to identify any specific testimony that should have been excluded and states in general terms that the state called 21 witnesses whose testimony filled 800 pages continued within nine volumes of transcript. "We are not obligated to search the record or formulate legal arguments on behalf of the parties * * *." *Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, at ¶ 19. Accordingly, this proposition of law is overruled.

**Indictment**

*Death Specifications*

{¶ 101} In the 11th and 12th propositions of law, Sowell takes issue with the manner in which the death specifications were alleged in the indictment and with the instructions submitted to the jury.

28

Course-of-Conduct Specifications

**{¶ 102}** The 11th proposition of law alleges that the state charged Sowell with duplicative course-of-conduct specifications.

**{¶ 103}** The indictment charged Sowell with 13 course-of-conduct death specifications for each count of aggravated murder. Each course-of-conduct specification charged him with a course of conduct consisting of the purposeful killing of the victim named in the aggravated-murder count and the purposeful killing (or attempt to kill) one of the other victims. For example, Count 1 charged Sowell with the aggravated murder of Tonia Carmichael. Specification 3 to Count 1 charged that the aggravated murder of Carmichael "was part of a course of conduct in which the offender purposely killed Tonia Carmichael and also purposely killed Nancy Cobbs." Specification 4 was identical, except that Tishana Culver's name was substituted for that of Cobbs. Thus, each victim of aggravated murder or attempted murder was named in a separate course-of-conduct specification.

**{¶ 104}** We have repeatedly held that this is not the correct way to allege course-of-conduct specifications under R.C. 2929.04(A)(5). "Multiple course-of-conduct specifications are duplicative and must be merged at the sentencing phase. * * * In fact, such multiple course-of-conduct specifications should not even be included in an indictment." *State v. Mitts*, 81 Ohio St.3d 223, 231, 690 N.E.2d 522 (1998). "Each aggravated murder count should thus contain only one specification that [the defendant's] acts were part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons." *State v. Spisak*, 36 Ohio St.3d 80, 84, 521 N.E.2d 800 (1988).

**{¶ 105}** However, we have also stated: "[I]f such multiple specifications are included in an indictment, the 'trial court should instruct the jury in the penalty phase that those duplicative specifications must be considered merged for purposes of weighing the aggravating circumstances against the mitigating factors.' " *Mitts*

at 231, quoting *State v. Garner*, 74 Ohio St.3d 49, 53, 656 N.E.2d 623 (1995). As Sowell concedes, in this case, the trial court did instruct the jury that the duplicative course-of-conduct specifications were merged into a single course-of-conduct specification.

{¶ 106} Sowell contends, however, that the trial court's correct instruction to the jury to consider only one course-of-conduct specification for each aggravated murder was insufficient to prevent prejudice. He argues that "the spillover effect of having previously determined 13 course-of-conduct specifications is inescapable and necessarily tainted the weighing process." This contention is speculative at best and inconsistent with the presumption that jurors follow the instructions given by a trial court judge. *See*, *e.g*., *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 54.

{¶ 107} Sowell also points out that the prosecutor's closing penalty-phase argument repeatedly stressed the number of victims involved in this case. However, there was nothing unfairly prejudicial in asking the jurors to consider the number of murders and attempted murders. The jury is required to consider evidence relevant to "the nature and circumstances of the aggravating circumstances." R.C. 2929.03(D)(1). Even though there was only one course of conduct, the number of murders and attempted murders making up that course of conduct is relevant to the nature and circumstances of the aggravating circumstance.

{¶ 108} Accordingly, Sowell's 11th proposition is overruled.

Felony-Murder Specifications

{¶ 109} The felony-murder specifications attached to each aggravated-murder count[1] charged that Sowell either "was the principal offender in the commission of the Aggravated Murder, or, if not the principal offender, committed

---

[1] Since the felony-murder specifications relating to Leshanda Long's murder were not submitted to the jury, this claim applies to the other ten aggravated murders.

the Aggravated Murder with prior calculation and design." During the guilt phase of the trial, when instructing the jury on the felony-murder specification, the court did not instruct the jurors that in order to convict Sowell of that specification, they had to agree unanimously on *which* of these two alternatives (principal offender or prior calculation and design) they found Sowell guilty.

{¶ 110} Sowell's 12th proposition of law correctly notes that the trial court's failure to so instruct constitutes error. *See State v. Moore*, 81 Ohio St.3d 22, 40, 689 N.E.2d 1 (1998).

{¶ 111} Sowell's contention is that the jury may have reached "patchwork verdicts" on the specification, i.e., finding him guilty of the specification without unanimously finding that one of the two alternatives had been proven. Sowell concedes, however, that he failed to object at trial, and therefore plain error is the appropriate standard of review.

{¶ 112} Plain error does not exist in this instance, because the jury unanimously found Sowell guilty of each of the aggravated-murder counts. And for each victim, one of the aggravated-murder counts alleged that Sowell acted with prior calculation and design. Those verdicts reflect the jury's unanimous determination that Sowell had committed each of the murders with prior calculation and design. Hence, contrary to Sowell's argument, there is no possibility that the trial court's omission of the unanimity instruction in this case led to a patchwork verdict. *See State v. Woodard*, 68 Ohio St.3d 70, 75, 623 N.E.2d 75 (1993); *Moore* at 40, citing *State v. Burke*, 73 Ohio St.3d 399, 405, 653 N.E.2d 242 (1995).

{¶ 113} Thus, Sowell cannot demonstrate that the outcome of the guilt phase clearly would have been different but for the alleged error. No plain error is present, and Sowell's 12th proposition is overruled.

*"Carbon-Copy" Rape Counts*

{¶ 114} The indictment against Sowell contained two pairs of identically phrased rape counts. Count 72 is identical to Count 73, and Count 78 is identical

to Count 79. Counts 72 and 73 charged Sowell with raping "Jane Doe II," i.e., Latundra Billups, as follows:

> *RAPE R.C. 2907.02(A)(2)*
> *DATE OF OFFENSE: September 22, 2009*
> The Grand Jurors, on their oaths, further find that the Defendant(s) unlawfully engaged in sexual conduct with Jane Doe II, by purposely compelling her to submit by force or threat of force, contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Ohio.

(Boldface, capitalization, and underlining sic.)

{¶ 115} Similarly, Counts 78 and 79 charged Sowell with raping "Jane Doe III," i.e., Shawn Morris, as follows:

> *RAPE R.C. 2907.02(A)(2)*
> *DATE OF OFFENSE: October 20, 2009*
> The Grand Jurors, on their oaths, further find that the Defendant(s) unlawfully did engage in sexual conduct with Jane Doe III by purposely compelling her to submit by force or threat of force, contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Ohio.

(Boldface, capitalization, and underlining sic.)

{¶ 116} In his fourth proposition of law, Sowell contends that the inclusion of these "carbon-copy" charges in the indictment denied him due process because they denied him adequate notice of the specific charges against him and because they left him open to being subjected to future jeopardy for the same offenses.

**{¶ 117}** Sowell's claim is based on *Valentine v. Konteh*, 395 F.3d 626 (6th Cir.2005). In *Valentine*, the defendant was indicted on 20 counts of rape of a minor and 20 counts of felonious sexual penetration of a minor. All 20 rape counts were worded identically with one another; likewise, all 20 penetration counts were worded identically with one another. Each count alleged that the offense had occurred "between March 1, 1995 and January 16, 1996." Neither the indictment nor the bill of particulars differentiated among the counts in any way.

**{¶ 118}** At trial, the victim testified that the defendant had raped her about 20 times and digitally penetrated her about 15 times. No dates were given for any of these incidents, nor were any other specific facts given whereby the trier of fact might have identified specific incidents. The defendant was convicted of 20 counts of rape and of felonious sexual penetration, although a court of appeals reversed five convictions for felonious sexual penetration. *Valentine* at 628-629.

**{¶ 119}** The Sixth Circuit determined that the accused in *Valentine* had been denied due process and was entitled to habeas corpus relief. The court explained that an indictment satisfies due process only "if it (1) contains the elements of the charged offense, (2) gives the defendant adequate notice of the charges, and (3) protects the defendant against double jeopardy." *Id.* at 631.

**{¶ 120}** *Valentine* held that the indictment in that case failed to give constitutionally adequate notice of the charges.

> [T]he constitutional error in this case is traceable * * * to the fact that there is no differentiation among the counts. * * * [I]f prosecutors seek multiple charges against a defendant, they must link those multiple charges to multiple identifiable offenses. * * * Courts cannot uphold multiple convictions when they are unable to discern the evidence that supports each individual conviction.

395 F.3d at 636-637.

{¶ 121} For similar reasons, the state's failure in *Valentine* to differentiate the charges, either in the indictment or at trial, also failed to protect the defendant against the future possibility of double jeopardy. "We cannot be sure what double jeopardy would prohibit because we cannot be sure what factual incidents were presented and decided by this jury." *Id*. at 635.

{¶ 122} This case is factually distinguishable from *Valentine*. First, instead of two sets of *20* identically phrased charges, this case presents two sets of *two* identically phrased charges. Moreover, each set of identical counts in this case alleges that the rapes took place on specifically identified dates, rather than over a period of eight and one-half months as in *Valentine*. And the state's evidence at trial showed that four specific, different acts of rape took place: two against Billups and two against Morris. Billups testified at trial that Sowell raped her twice on September 22, 2009, and Morris testified that Sowell raped her twice on October 20, 2009.

{¶ 123} On these facts, it cannot be said that "there was no differentiation among the counts." 395 F.3d at 636. Unlike *Valentine*, the record in this case does not leave the court "unable to discern the evidence that supports each individual conviction." *Id*. at 637. Rather, *Valentine* involved a situation with little resemblance and no applicability to this case. This proposition of law lacks merit.

*No Allegation that Aggravation Outweighs Mitigation*

{¶ 124} In his 14th proposition, Sowell argues that the indictment against him was insufficient because it failed to allege that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. He claims that the intersection of Ohio and federal constitutional law requires that an averment of this type be included in a capital indictment.

{¶ 125} Sowell notes the Ohio Constitution's guarantee that "no person shall be held to answer for a capital, or otherwise infamous, crime, unless on

presentment or indictment of a grand jury." Article I, Section 10, Ohio Constitution. Citing *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Sowell then argues that the fact that the aggravating circumstances outweigh the mitigating factors is "the functional equivalent of an element," *Apprendi* at 494, fn. 19, of the capital offense, because a jury's determination that the aggravating circumstances outweigh the mitigating factors is required for a death sentence under Ohio law. Finally, because the "fact" that the aggravating circumstances outweigh the mitigating factors is to be considered an "element" of the offense, Sowell argues that "it must be first found by the grand jury and included in the indictment" before it can be submitted to a petit jury.

{¶ 126} His claim is not well taken. *Apprendi* and *Ring* are rooted in the Sixth Amendment right to a jury trial. "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum *must be submitted to a jury, and proved beyond a reasonable doubt*." (Emphasis added.) *Apprendi* at 490.

{¶ 127} In contrast, "[t]he purposes of an indictment are to give an accused adequate notice of the charge, and enable an accused to protect himself or herself from any future prosecutions for the same incident." *State v. Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162, ¶ 7. "[W]e have recognized that even when an indictment fails to charge the mens rea of the offense, it is not defective as long as it 'tracks the language of the criminal statute describing the offense,' because that suffices to 'provide[ ] the defendant with adequate notice of the charges against him." (Brackets sic.) *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 24, quoting *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 45. Similarly, "[a]n indictment that tracks the language of the charged offense and identifies a predicate offense by reference

to the statute number need not also include each element of a predicate offense." *Buehner* at the syllabus.

{¶ 128} In this case, the capital charges in the indictment tracked the language of R.C. 2903.01(A) and (B), and the death specifications tracked the language of R.C. 2929.04(A)(5) and (A)(7). Sowell does not contend that the indictment's omission of any averment as to the relative weight of aggravation and mitigation deprived him of adequate notice of the charges against him. Thus, the indictment satisfies Article I, Section 10 of the Ohio Constitution, and this proposition of law is overruled.

**Penalty Phase**

*Exclusion of Sowell's Plea Offer*

{¶ 129} Sowell's eighth proposition of law asserts that the trial court should have permitted the defense to inform the jury during the penalty phase that he had offered to plead guilty in exchange for a life sentence. Sowell claims that this offer was evidence of his acceptance of responsibility, and he argues the trial court was required to admit it into evidence.

{¶ 130} We previously considered and rejected a similar argument in *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, stating: "The trial court also ruled correctly by not allowing Dixon to introduce his offer to plead guilty in exchange for dismissal of the death specifications. * * * [A] defendant's offer to plead guilty, never accepted by the prosecutor, is not relevant to the issue of whether the defendant should be sentenced to death." *Id.* at ¶ 69; *see also Owens v. Guida*, 549 F.3d 399, 419-422 (6th Cir.2008) (collecting cases). We reaffirm our holding in *Dixon*, and accordingly, we reject this claim.

*Mercy Instruction*

{¶ 131} The eighth proposition of law also claims that the trial court improperly refused to give a proposed mercy instruction: "Mercy is a mitigating factor that weighs against voting for the death penalty * * *." We have consistently

rejected similar claims. *See State v. Lorraine*, 66 Ohio St.3d 414, 417-418, 613 N.E.2d 212 (1993); *State v. O'Neal*, 87 Ohio St.3d 402, 416, 721 N.E.2d 73 (2000); *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 93. In accord, this eighth proposition of law is overruled.

*"Presumption of Life" Instruction*

{¶ 132} Sowell's ninth proposition of law asserts that the trial court erred by failing to instruct the jury to apply a "presumption" in favor of a life sentence.

{¶ 133} Sowell had requested a jury instruction that "there is a presumption of life until and unless the state proves beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors and that death is the only appropriate punishment." The court declined the requested instruction, but did instruct the jury:

> In order for you to decide that the sentence of death shall be imposed upon Anthony Sowell, the State of Ohio must prove beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty are sufficient to outweigh the factors in mitigation of imposing the death sentence.
>
> The defendant does not have any burden of proof.

The trial court later instructed that after considering the evidence relevant to the aggravating circumstances and the mitigating factors, the jurors were to

> then decide whether the State of Ohio proved beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors present in this case.
>
> * * *

If you find that the State of Ohio has failed to prove beyond a reasonable doubt that the aggravating circumstances Anthony Sowell is guilty of committing are sufficient to outweigh the mitigating factors present in this case, then it is your duty to decide that the sentence of life imprisonment without the possibility of parole should be imposed upon the defendant.

{¶ 134} We have held that "it is prejudicial error in a criminal case to refuse to administer a requested charge which is pertinent to the case, states the law correctly, and is not covered by the general charge." *State v. Scott*, 26 Ohio St.3d 92, 101, 497 N.E.2d 55 (1986). "However, the trial court need not give the defendant's requested instructions verbatim but may use its own language to communicate the same legal principles to the jury." *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 108, citing *State v. Sneed*, 63 Ohio St.3d 3, 9, 584 N.E.2d 1160 (1992).

{¶ 135} As defense counsel explained to the trial court when arguing in favor of the proposed instruction, the "presumption of life" instruction was intended to convey "that the State has the burden of proof at all times" and in particular, "the burden of proving * * * that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. * * * Life is the default judgment * * * unless the State meets their burden."

{¶ 136} Here, the trial court's instructions properly conveyed the state's burden of proof, and the requested instruction was therefore "covered by the general charge." *Scott* at 101. This ninth proposition of law is not well taken.

**Ineffective Assistance of Counsel**

{¶ 137} In the fifth and 17th propositions of law, Sowell alleges that his trial counsel rendered ineffective assistance of counsel.

**{¶ 138}** To establish ineffective assistance of counsel, an appellant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

**{¶ 139}** The fifth proposition of law contends that defense counsel rendered ineffective assistance by not conceding Sowell's guilt during the guilt phase of trial. The argument is that the evidence of guilt was so overwhelming that a reasonable-doubt defense was hopeless. Under those circumstances, Sowell contends, conceding guilt was "the only reasonable strategy," because the only thing to do was to throw all possible effort into avoiding a death sentence. No rational lawyer, he argues, would have tried to obtain an acquittal.

**{¶ 140}** Sowell relies on *Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), which held that a defense trial counsel, who failed to obtain the defendant's consent to the strategy, had *not* rendered ineffective assistance by expressly conceding his client's guilt in the guilt phase and attempting instead to focus on saving his client's life. *Nixon* explained why competent counsel might feel that conceding the client's guilt would be the best strategy in a capital case: when the defendant's guilt is clear, pursuing a reasonable-doubt defense in the guilt phase may be counterproductive, fostering cynicism in the jurors and making them less receptive to mitigating factors in the penalty phase. *Id.* at 192. "Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared." *Id.*

**{¶ 141}** *Nixon* holds that choosing not to contest guilt may be a reasonable strategy in a given case and does not stand for the proposition that it is

*impermissible* for defense counsel to contest guilt in the face of overwhelming evidence.

> Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955).

{¶ 142} Sowell fails to demonstrate prejudice because his claim depends on speculation about the jury's possible reaction to his counsel's strategy. But speculation is insufficient to demonstrate prejudice as defined by *Strickland*, i.e., a reasonable probability that, but for counsel's alleged errors, the outcome of the proceeding would have been different. This proposition is overruled.

{¶ 143} In the 17th proposition of law, Sowell contends that his counsel were ineffective in failing to preserve the alleged errors that are the subjects of his fourth, sixth, and 12th propositions of law. He argues that in a capital case, "the failure to preserve error must be deemed inherently deficient" and "necessarily" prejudicial.

{¶ 144} To the contrary, "[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988). And Sowell's definition of prejudice is not supported by *Strickland*. It is not enough that an alleged error resulted in a disadvantage for an accused. *See Strickland*, 466 U.S at 693, 104 S.Ct. 2052, 80 L.Ed.2d 674 (it is not sufficient for a defendant to show that errors impaired

presentation of the defense). *Strickland*'s prejudice inquiry focuses on the likelihood that, "but for counsel's unprofessional errors, the *result of the proceeding* would have been different." (Emphasis added.) *Id*. at 694.

{¶ 145} Sowell further contends that counsel's failure to object to "duplicate" Counts 72, 73, 78, and 79 in the indictment based on *Valentine v. Konteh* constituted ineffective assistance of counsel. But as noted in the discussion of his fourth proposition, *Valentine* is readily distinguishable on its facts, and counsel's failure to make a *Valentine*-based objection to the indictment was not deficient performance. Nor could Sowell demonstrate prejudice, because the unrebutted testimony of Latundra Billups and Shawn Morris established that Sowell raped each of them twice on the specific dates alleged in the indictment, so he cannot show that but for counsel's failure to object, he would not have been convicted on those counts.

{¶ 146} Sowell next argues that his counsel failed to object to "victim impact evidence" in the guilt phase. However, as explained in the discussion of his sixth proposition of law, he fails to identify any specific evidence or testimony that should have been excluded. Thus, he fails to show either deficient performance or prejudice. *See Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, at ¶ 19.

{¶ 147} Finally, Sowell urges that counsel failed to object to the felony-murder specifications alleging in the alternative that he was the principal offender *or* that he killed with prior calculation and design. As noted in the discussion of the 12th proposition of law, the trial court erred in the instructions given to the jury in this regard. But—as we explained in the discussion of that proposition—the jury unanimously found Sowell guilty of felony murder with prior calculation and design. For this reason, he cannot demonstrate that the outcome would have been different but for the error. Thus, the 17th proposition of law is overruled.

**Cumulative Error**

{¶ 148} In the 16th proposition of law, Sowell claims that the cumulative effect of the various errors he alleges denied him a fair trial. However, "[a]s [Sowell] offers no further analysis, this proposition lacks substance." *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 103. This proposition is overruled.

**Constitutional Challenges to Death Penalty Statutes**

*Denial of Jury Sentencing in Guilty-Plea Cases*

{¶ 149} The 13th proposition of law claims that Ohio law denies capital defendants who plead guilty their constitutional right to a jury determination of whether the aggravating circumstance outweigh the mitigating factors. In this case, however, Sowell did not plead guilty but rather was tried by jury. Thus, he has no standing to raise the issue of what he would have been entitled to had he elected to plead guilty.

{¶ 150} He further claims that Crim.R. 11(C)(3) unconstitutionally penalizes a capital defendant's exercise of his right to a jury trial. But we have rejected similar attacks on Crim.R. 11(C)(3). *See*, *e.g*., *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 51, citing *State v. Dickerson*, 45 Ohio St.3d 206, 214, 543 N.E.2d 1250 (1989), and *State v. Buell*, 22 Ohio St.3d 124, 138, 489 N.E.2d 795 (1986). Therefore, this proposition is overruled.

*Settled Issues*

{¶ 151} "The proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987), paragraph one of the syllabus. In his 15th proposition, Sowell asks this court to reconsider *Steffen*'s interpretation of R.C. 2929.05(A) with respect to the scope of proportionality review. But he offers no persuasive reason for us to do so, and we decline his invitation. Sowell also argues that Ohio's death-penalty

scheme provides constitutionally inadequate appellate review of the proportionality of the death sentence. We reject this claim. *See Steffen* at 123, citing *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23.

{¶ 152} In the 18th proposition of law, Sowell claims that the death penalty and Ohio's statutory provisions for its administration are unconstitutional and violate international law. Having already rejected each of those claims in prior cases, we summarily overrule his 18th proposition of law. *See generally Spisak*, 36 Ohio St.3d at 82, 521 N.E.2d 800; *State v. Poindexter*, 36 Ohio St.3d 1, 520 N.E.2d 568 (1988), syllabus.

### Independent Sentence Review

{¶ 153} Sowell was sentenced to death on 11 counts of aggravated murder. A sentence of death can be affirmed only if we find beyond a reasonable doubt that the aggravating circumstances he was found guilty of committing outweigh the mitigating factors. R.C. 2929.05(A). In his seventh proposition of law, Sowell contends that on independent review, this court should find that the aggravating circumstances do not outweigh the mitigating factors beyond a reasonable doubt for any of the 11 aggravated murders he committed.

*Aggravating Circumstances*

{¶ 154} R.C. 2929.04 describes the death-penalty specifications to be included in an indictment and provides:

(A) Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:

* * *

(5) Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.

\* \* \*

(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

{¶ 155} The jury returned verdicts finding Sowell guilty of 13 course-of-conduct specifications for each victim, R.C. 2929.04(A)(5). With respect to ten of the aggravated murders, the jury also found him guilty of two felony-murder specifications under R.C. 2929.04(A)(7): one predicated on kidnapping under R.C. 2905.01(A)(3) (having a purpose to terrorize or to inflict serious physical harm) and one predicated on kidnapping under R.C. 2905.01(A)(4) (having a purpose to engage in sexual activity with the victim against the victim's will). And on each of the felony-murder specifications, the jury further found that Sowell was either the principal offender or had acted with prior calculation and design.

{¶ 156} Before submitting the case to the jury at the penalty phase, the trial court merged the 13 course-of-conduct specifications into a single one for each aggravated murder. The court further merged the two kidnapping specifications into a single one for each of the ten aggravated murders to which they applied. Accordingly, this court has two aggravating circumstances to weigh against the

mitigating factors for the murders of Carmichael, Cobbs, Culver, Dozier, Fortson, Hunter, Mason, Smith, Turner, and Webb—i.e., course-of-conduct and felony-murder specifications.

{¶ 157} The felony-murder specifications for Leshanda Long's murder were dismissed under Crim.R. 29. Hence, only the course-of-conduct aggravating circumstance remains to be weighed against the mitigating factors for that murder.

{¶ 158} The overwhelming evidence presented at trial supports the jury's findings that these aggravating circumstances existed.

*Mitigating Factors*

{¶ 159} We are required to determine whether the aggravating circumstances proven in this case outweigh the mitigating factors beyond a reasonable doubt. In doing so, we consider whether there is anything mitigating about the "nature and circumstances of the offense, [or] the history, character, and background of the offender," R.C. 2929.04(B), as well as the following specific mitigating factors: R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of a significant criminal record), (B)(6) (accomplice only), and (B)(7) (any other relevant factors).

{¶ 160} Sowell was born in Cleveland in 1959. In the 1960s, his parents divorced, and he was raised by his mother, Claudia Garrison. Also living with Claudia were her mother, Irene Justice, and Sowell's siblings Tressa Garrison and Owen "Junior" Davis. Sowell's sister, Patricia Davis Hatcher, died in 1969, and Claudia took in Patricia's children, Robin, Ramona, Leona, and Monica Davis and Pearl, Jesse Darnel, and Nate Hatcher.

{¶ 161} Ramona and Leona Davis testified that they and Monica were subjected to regular, severe abuse while living with Claudia. If one of the children did something wrong, Claudia would strip the child naked, tie her to a bannister, and beat her with an extension cord until Claudia was tired or Irene would beat the

child with a switch or cane. A beating might take place at any time, including at 2:00 or 3:00 a.m., and sometimes for a petty reason such as a dirty dish being left in the sink. Jesse testified that Claudia gave him similar beatings that were administered almost daily and were at times severe enough to draw blood.

{¶ 162} According to the Davis children, Claudia never subjected her own children to these beatings. However, the other children, including Sowell, observed the beatings. At times, Jesse testified, Sowell "sat there and laughed."

{¶ 163} Leona Davis also testified that when she was ten years old, Sowell (who was then about 11) raped her almost every day.

{¶ 164} Sowell attended Prospect Elementary School and Kirk Junior High in East Cleveland. His teachers during spring 1971 and 1972-1973 testified that he was an "average" or "unexceptional" student, sometimes enthusiastic, with a good or near-perfect attendance record. Neither teacher observed any indication that he had been physically abused.

{¶ 165} Lori James-Townes, a social worker and Director of Social Work for the Maryland Public Defender's office who also has a private forensic practice, investigated and testified about Sowell's family history. She found that Sowell had been subjected to emotional abuse, including witnessing the other children being beaten and being told by his mother that he would never amount to anything. Moreover, Claudia told James-Townes that she had awakened him and beaten him with a cord on one occasion.

{¶ 166} James-Townes testified that Sowell told her that he had been sexually molested during his childhood, but she found no evidence to corroborate this. However, she testified that Sowell's molestation of Leona Davis was a "red flag that something's going on in the house."

{¶ 167} In 1978, Sowell entered active duty in the Marine Corps and served until 1985. Walter C. Bansley, a criminal attorney and former Marine officer and

46

Judge Advocate, reviewed Sowell's military records and rendered his expert opinion as to what they revealed about Sowell.

{¶ 168} When Sowell graduated from boot camp, he was immediately promoted to private first class, the only Marine in his 55-member platoon to receive this "extreme distinction." He was awarded two Good Conduct Medals, each reflecting three years of service without disciplinary action, and received additional awards for good performance. He was promoted successively to lance corporal, corporal, and sergeant. He was chosen to attend an advanced electrician's school; according to Bansley, only 30 percent of Marines in any given military occupational specialty are chosen for an advanced school.

{¶ 169} During his Marine career, Sowell was involved in what Bansley described as two minor disciplinary matters. Both times, he received "nonjudicial punishment" rather than a court-martial; according to Bansley, this indicates that Sowell's superiors thought he had potential and did not consider the incidents significant. Despite these incidents, Sowell's conduct marks exceeded the requirement for an honorable discharge, which he received in 1985. In Bansley's opinion, Sowell was an "above average" Marine.

{¶ 170} In 1990, Sowell was convicted of attempted rape, and he served 15 years in prison. Roosevelt Lloyd, a convicted rapist, served ten years with him at Grafton Correctional Institution, working alongside him and sharing a cubicle with him for seven years. Lloyd described Sowell as "a nice, loving, caring person." Lloyd said he had been "in shock" when he learned what Sowell had done. Lloyd expressed strong loyalty to Sowell: "I love that man * * * and he will always be my friend. * * * I want to be by his side regardless of what happens * * *."

{¶ 171} In prison, Sowell was a food handler, which Lloyd described as "a very responsible position." It was his responsibility to make sure that each of Grafton's estimated 1,400 to 1,600 inmates had a meal at mealtimes. This involved

supervising cooks, keeping track of the number of meals served, and ensuring that the portions were correct.

{¶ 172} Soon after his release in 2005, Sowell enrolled in a program called "Towards Employment" offered in part to help place ex-offenders in jobs, and he took a job-readiness workshop. Deborah Lucci, who helped place Sowell in a job, testified that he was neat, clean, and punctual, had good attendance, and "presented himself as job ready." Towards Employment helped Sowell find a job operating an injection-mold machine at a Cleveland business that manufactured rubber products. A former coworker testified that he performed well.

{¶ 173} In February 2007, Sowell suffered a heart attack and was hospitalized. Eventually he returned to work. He was initially put on light duty, then was released to return to full duty. However, by July 2007 he was physically unable to perform his duties and had to leave his job.

{¶ 174} Four officers from the Cuyahoga County Jail testified that Sowell was well-behaved during his pretrial incarceration. Indeed, two described him as a "model inmate."

{¶ 175} Dr. Dale Watson, a clinical and forensic neuropsychologist, testified on behalf of Sowell. He performed a comprehensive set of neuropsychological evaluations on Sowell, administering between 45 and 50 tests, including tests designed to detect malingering, over three sessions totaling 19 hours.

{¶ 176} Dr. Watson concluded that Sowell showed "probably * * * a moderate degree of [brain] dysfunction or impairment." Dr. Watson concluded that Sowell had "had some sort of neurological event that affected his processing speed." He noted that "a heart attack where there's not adequate oxygenation" could "impact brain function." Dr. Watson further concluded that Sowell's results did not indicate malingering.

**{¶ 177}** Dr. Watson testified that Sowell claimed that after his heart attack, he had auditory hallucinations. Specifically, Sowell reported hearing a voice, which he called "Arnie." However, when Dr. Watson raised this subject again, Sowell denied having had such hallucinations. Dr. Watson believed Sowell's initial claim and questioned his later denial.

**{¶ 178}** Dr. Diana Goldstein, a neuropsychologist who testified on behalf of the state, examined Sowell's medical records and reached conclusions that differed sharply from Dr. Watson's. Dr. Goldstein found nothing in Sowell's medical records to support a history of cognitive or psychiatric disorder, before or after Sowell's heart attack.

**{¶ 179}** She noted that Sowell's doctors had not requested neurodiagnostic testing on him after the heart attack, which would have been called for if he had had the type of heart attack that leads to respiratory failure. She also noted that, in the emergency room, Sowell's Glasgow coma scale score was a maximum 15, which indicates that there was no brain injury, and that his oxygen-saturation levels when he arrived at the emergency room were 96 percent. She stated that "all of that indicates that there was not a neurologic event" that would have compromised Sowell's brain functioning.

**{¶ 180}** Dr. Goldstein also reviewed Dr. Watson's report. She concluded that in all cognitive domains, Sowell's testing indicated normal functioning. There was a minority of "abnormal" test findings that she said were "difficult to explain, given how well he does on all of the other tests that measure the exact same thing." Since there was no evidence that Sowell was undergoing a "medical crisis" at the time Dr. Watson was testing him, Dr. Goldstein concluded that "fluctuations in effort" explained the anomalous results. Dr. Goldstein testified that this did not necessarily mean that Sowell malingered, but she could not rule out malingering.

**{¶ 181}** Dr. George Woods, a neuropsychiatrist, interviewed Sowell three times for a total of about six or seven hours and testified that Sowell lacked the

substantial capacity to conform his conduct to the requirements of the law. Dr. Woods diagnosed Sowell with the following conditions: (1) obsessive-compulsive disorder ("OCD"), which Dr. Woods described as severe, chronic, and sexual in nature; (2) posttraumatic stress disorder ("PTSD") essentially consisting of two types, one resulting from "type-two trauma," a "chronic ongoing trauma" such as would result from "ongoing childhood abuse" and another from "type-one trauma," a single traumatic event such as a heart attack; (3) psychosis not otherwise specified; and (4) cognitive disorder not otherwise specified.

{¶ 182} Dr. Woods explained that childhood abuse causes anxiety, which leads to compulsive behavior stemming from a desire to control that anxiety. He described an obsessive-compulsive "cycle": obsessive thoughts lead to anxiety; anxiety leads to attempts to control the anxiety by means of compulsive behavior; compulsive behavior brings temporary relief, but then the anxiety returns. For OCD sufferers, "control is everything"; if the sufferer loses control, "the response is completely out of proportion to the stimulus." A structured setting helps the OCD sufferer control his compulsions, by reducing anxiety.

{¶ 183} Dr. Woods testified that Sowell performed well in the structured setting of the military; in civilian life after his discharge, he worked for a time, then his obsessions got the better of him and he was convicted of attempted rape. He then performed well in the structured environment of prison. After Sowell's release from prison, his work provided structure, and he was successful at his job, but after his heart attack, he lost his job. This removed the structure that, according to Dr. Woods, helped him control his obsessions. Depression impaired his ability to think.

{¶ 184} Dr. Woods also observed that OCD and PTSD "augment each other," creating "both atypical and more severe symptoms" than if only one disorder is present. PTSD can cause dysregulation, which is a tendency to overreact or underreact; Sowell's tendency was to overreact. If one is dysregulated and at the

same time is attempting to control anxiety, the resulting compulsive behavior can be "very terrible."

{¶ 185} Dr. James Knoll IV testified for the state in rebuttal. He is a full-time practicing psychiatrist and forensic psychiatrist who has studied and published on the subject of serial murder. He strongly disagreed with Dr. Woods's conclusions.

{¶ 186} Dr. Knoll noted that a 2005 report prepared by the Cuyahoga County Court Psychiatric Clinic showed an absence of significant psychiatric illness in Sowell's life. Moreover, county jail records that he reviewed indicated that antipsychotic medications had not been prescribed for Sowell during his two-year pretrial incarceration.

{¶ 187} Dr. Knoll also noted that Sowell had not been diagnosed with OCD while in the Marines. "A true diagnosis of genuine significant obsessive-compulsive disorder would quite likely be the end of one's military career," he testified, because OCD would substantially interfere with one's functioning. Dr. Knoll also testified that Dr. Woods's diagnosis of severe, chronic OCD with sexual obsession was flawed, because "there's simply no such diagnosis in existence in psychiatry."

{¶ 188} Dr. Knoll believed that Dr. Woods did not adequately consider the possibility that Sowell was malingering when he reported auditory hallucinations. To Dr. Knoll, Dr. Woods's report indicated no effort to "delve into" Sowell's claim of hearing voices. In the forensic setting, Dr. Knoll testified, it is "fundamental" to consider possible malingering, and "failure to do so is a critical error."

{¶ 189} Another "serious error" in Dr. Woods's analysis, according to Dr. Knoll, was his failure to consider sexual sadism as a diagnosis. Dr. Knoll testified that sexual sadism is a "paraphilia," a mental disorder involving sexual deviancy, in which the sadist is aroused by the fear and suffering of his victim. According to

Dr. Knoll, sexual sadism, domination and control, and anger toward an "identified victim pool" are common motivations in serial murders.

{¶ 190} Dr. Knoll testified that murder by choking or strangulation suggests sexual sadism, as does the use of bindings or restraints. He further noted that the testimony of the victims who survived Sowell's assaults indicates Sowell's intense anger at women. Additionally, Sowell had previously committed a "sadistic rape" in 1989 in which he had bound, gagged, and choked the victim.

{¶ 191} Dr. Knoll also testified that inability to control conduct is a "controversial" subject in forensic psychiatry, because there are "no specific scientific methods to determine that."

{¶ 192} Sowell made an unsworn statement in court. Much of it repeated previous testimony offered on his behalf. He stated that he had been sexually abused as a child by a female, described life in his childhood home as "like a war" with "constant yelling and screaming," and said that he joined the Marines to "escape." He concluded by apologizing for his crimes.

{¶ 193} Sowell contends that the following mitigating factors exist.

{¶ 194} (1) He is not dangerous while in a structured environment such as prison. Evidence in the record supports this factor, and we give it modest weight. *See State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 303.

{¶ 195} (2) "Those who have done worse have been allowed to live." Here Sowell cites an assortment of notorious murderers from *other jurisdictions* who did not receive death sentences and contends that, since they were not sentenced to death, he should not be either.

{¶ 196} We reject this argument. The crimes of others cited by Sowell are wholly unrelated to his character or record or the circumstances of his own crimes. Hence, those cases do not constitute mitigating factors. *See State v. McGuire*, 80 Ohio St.3d 390, 403, 686 N.E.2d 1112 (1997) (rejecting residual doubt as mitigating factor because it is not related to offender's character or record or the

circumstances of the offense); *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 124 (for the same reason, impact of offender's execution on his family is not a mitigating factor).

{¶ 197} (3) Sowell "tried to accept responsibility" by offering to plead guilty in exchange for a life sentence without the possibility of parole. As we note in our discussion of Sowell's eighth proposition of law, Sowell's plea offer is not a mitigating factor. *Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, at ¶ 69 ("a defendant's offer to plead guilty, never accepted by the prosecutor, is not relevant to the issue of whether the defendant should be sentenced to death").

{¶ 198} (4) Sowell's allegedly chaotic and abusive family background. This court has " 'seldom given decisive weight to' a defendant's unstable or troubled childhood." *State v. Perez,* 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 245, quoting *Hale,* 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 265. It deserves nominal weight here.

{¶ 199} (5) His work record and honorable military service. These "are entitled to some weight as mitigating factors." *State v. D'Ambrosio*, 73 Ohio St.3d 141, 146, 652 N.E.2d 710 (1995); *see also Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, at ¶ 302.

{¶ 200} (6) The murders in this case were not "planned and calculated," as is allegedly shown by his supposedly impulsive assault on Shawn Morris. However, Sowell was convicted of committing these murders with prior calculation and design, and the record supports that finding. This factor, therefore, deserves no weight.

{¶ 201} (7) His alleged OCD, psychosis, and other mental problems. In view of the conflicting expert testimony on this subject, we give it little weight.

{¶ 202} The aggravating circumstances in this case are entitled to significant weight. The mitigating factors that are present, however, are entitled to modest, nominal, some, and little weight, respectively. We conclude that as to each

of the 11 murders in this case, the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

{¶ 203} Finally, we also conclude that the death sentences in this case are appropriate and proportionate when compared with similar capital cases. *See Lundgren*, 73 Ohio St.3d at 496, 653 N.E.2d 304; *State v. Brown*, 38 Ohio St.3d 305, 321, 528 N.E.2d 523 (1988).

{¶ 204} Accordingly, we affirm Sowell's convictions and sentences of death.

Judgment affirmed.

PFEIFER, LANZINGER, KENNEDY, and FRENCH, JJ., concur.

O'CONNOR, C.J., dissents, with an opinion.

O'NEILL, J., dissents, with an opinion joined in part by O'CONNOR, C.J.

———————————

**O'CONNOR, C.J., dissenting.**

{¶ 205} I join the dissenting opinion of Justice O'Neill to the extent that he would find structural error and remand this case to the trial court for a new suppression hearing that is either public or is closed after making the findings required by *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). I do not join the dissenting opinion, however, to the extent that it states that capital punishment is unconstitutional.

———————————

**O'NEILL, J., dissenting.**

{¶ 206} Respectfully, I dissent.

{¶ 207} In addition to my belief that capital punishment is unconstitutional, *see State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900, ¶ 2 (O'Neill, J., dissenting), I dissent from the majority's decision in this case that closure of the courtroom during Anthony Sowell's suppression hearing was not a material error and that the error therefore can be ignored.

{¶ 208} In cases such as this that involve unspeakable horror and overwhelming evidence of guilt, it is tempting to overlook procedural safeguards and skip to the end. However in a criminal-justice system governed by the rule of law, a serial murderer's trial is subject to the same constitutional protections as the trial of a low-level thief. Just as there is no question that closed suppression hearings may sometimes be necessary, there is also no question that the necessity must be explained. The majority correctly identifies the issue and the law regarding the closure of Sowell's suppression hearing. However, by failing to remand this case to the trial court for a new suppression hearing that is either public or is closed only after the findings required by *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) are made, this court has perpetuated rather than resolved a structural defect in this case.

{¶ 209} A structural defect can invalidate the result of a suppression hearing or a conviction even though there may be no reasonable doubt that the defendant is guilty and would have been convicted if the defect had not been present. *Waller* at 49; *accord Arizona v. Fulminante*, 499 U.S. 279, 309-310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Structural defects include violations of the right to counsel at trial, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); the right to an impartial judge, *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); the prohibition of the unlawful exclusion of members of the defendant's race from a grand jury, *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); the right to self-representation at trial, *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); and the right to a public trial, *Waller* at 49, *Fulminante* at 310. The underlying principles are that " '[w]ithout these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence' " and that the criminal punishment cannot " 'be regarded as fundamentally fair.' " *Id.*, quoting *Rose v. Clark*, 478 U.S. 570, 577-578, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).

{¶ 210} The requirement of a public trial is for the benefit of the accused and the public. *Waller* at 46. It is so the public can see that the defendant is treated fairly and is not unjustly condemned. *Id.* I cannot stress strongly enough that the right to a fair, public trial belongs both to the accused and to the citizens of Ohio with equal value. They both need to have confidence in the ultimate outcome. It also serves to make those trying an accused keenly aware of their responsibility and of the importance of their task. *Id.*

{¶ 211} In *Waller*, the Supreme Court of the United States held that the right to a public trial extends to suppression hearings. *Id.* at 46-47. The high court has been clear, however, that the right to an open suppression hearing may give way to other interests, such as the government's interest in shielding disclosure of sensitive information or the defendant's right to a fair trial. *Id*. at 45. In such circumstances, any closure of a suppression hearing over the objection of the defendant must be supported by trial-court findings that the closure is essential to preserve higher values and that the closure is narrowly tailored to serve an overriding interest. *Id.* Importantly the Supreme Court requires a trial court to articulate the interest at stake along with the findings specifically enough that a reviewing court can determine whether the closure order was properly entered. *Id.* If these findings were not made, the remedy is a new suppression hearing. *Id*. at 49-50. Here, as the majority observes, the trial court identified the overriding interest at stake—the sensitive nature of the evidence and potential prejudice to the jury pool. However, as the majority also observes, the trial court failed to make the findings required under *Waller* to justify closing the courtroom.

{¶ 212} The majority's conclusion that a new suppression hearing is needed only if it would result in a material change in the positions of the parties is incorrect. Reliance on *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 87, to support this conclusion is misplaced at best. The closed proceeding in *Bethel* was not a suppression hearing regarding statements made to the police. The

purpose of the closed hearing in *Bethel* was to explain to Bethel the consequences of his guilty plea. *Id.* at ¶ 86. Significantly, Bethel withdrew his guilty plea and opted to go to trial. *Id.*

{¶ 213} Requiring a defendant to show a material change in the positions of the parties in order to secure the defendant's constitutional right to a public suppression hearing is the same as requiring a defendant to demonstrate prejudice. The United States Supreme Court's holding in *Waller* is clear: the closure of a suppression hearing without making the findings justifying closure is structural error. *Waller*, 467 U.S. at 49, 104 S.Ct. 2210, 81 L.Ed.2d 31. The remedy for this structural error is a new suppression hearing. *Id*. at 49-50. If, after the new suppression hearing, there is no material change in the positions of the parties or the same evidence is suppressed, then a new trial is not in the public interest. *Id*. at 50. It is only *after* the new suppression hearing is held that an examination of the positions of the parties becomes relevant or even possible.

{¶ 214} The overwhelming evidence of Sowell's guilt cannot cure this defect. A structural error permeates the proceeding such that the proceeding cannot " ' "reliably serve its function as a vehicle for determination of guilt or innocence." ' " *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 17, quoting *Fulminante*, 499 U.S. at 310, 111 S.Ct. 1246, 113 L.Ed.2d 302, quoting *Rose*, 478 U.S. at 577-578, 106 S.Ct. 3101, 92 L.Ed.2d 460. This court simply cannot choose to ignore the rulings of the United States Supreme Court on this issue. *Cooper v. Aaron*, 358 U.S. 1, 17-18, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *State v. Burnett*, 93 Ohio St.3d 419, 422, 755 N.E.2d 857 (2001) (state courts must follow decisions of the United States Supreme Court on questions of federal constitutional law). Accordingly, this case should be remanded to the trial court for a new suppression hearing that either is public or includes trial-court findings justifying closure.

{¶ 215} I dissent.

_____

Timothy J. McGinty, Cuyahoga County Prosecuting Attorney, and Christopher D. Schroeder and T. Allan Regas, Assistant Prosecuting Attorneys, for appellee.

Gamso, Helmick & Hoolahan and Jeffrey M. Gamso; and Robert L. Tobik, Cuyahoga County Public Defender, and Erika Cunliffe, Assistant Public Defender, for appellant.

Freda J. Levenson, urging reversal for amicus curiae, American Civil Liberties Union.

_____